**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| BRIAN BABINSKI and PATRICK KENNEDY, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SIEMENS ENERGY, INC., THE BOARD OF DIRECTORS OF SIEMENS ENERGY, INC., THE SIEMENS ENERGY, INC. ADMINISTRATIVE COMMITTEE, THE SIEMENS ENERGY, INC. INVESTMENT COMMITTEE and JOHN DOES 1-40,<br><br>Defendants. | **CIVIL ACTION NO.: 4:25-cv-03381** |

## AMENDED COMPLAINT[1]

Plaintiffs, Brian Babinski and Patrick Kennedy ("Plaintiffs"), by and through their attorneys, on behalf of the Siemens Energy, Inc. Savings Plan (the "Plan"),[2] themselves and all others similarly situated, state and allege as follows:

## I. INTRODUCTION

1. This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, Siemens Energy, Inc. ("Siemens"), the Board of Directors of Siemens Energy, Inc. (the "Board"), the Siemens Energy, Inc. Administrative Committee ("Administrative

[1] Plaintiffs file this Amended Complaint pursuant to FED. R. CIV. P. 15(a)(1)(B).

[2] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

Committee") and the Siemens Energy, Inc. Investment Committee (the "Investment Committee") (collectively, Siemens, the Board, the Administrative Committee and the Investment Committee are referred to as the "Defendants") for breaches of their fiduciary duties.

2. The Plan is a defined contribution retirement plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. *See* Siemens Energy, Inc. Savings Plan Summary Plan Description, as of January 1, 2024 ("SPD"), at 34, ("This Plan is a defined contribution plan. This means that Company contributions are made in specific (defined) amounts, but the benefit you receive at retirement or termination depends on a number of variable factors."); *see also* Independent Auditor's Report ("Auditor's Report"), attached to 2023 Form 5500 for the Plan, at 7 ("The Plan is a defined contribution plan sponsored by Siemens Energy, Inc. (the Company or the Plan Sponsor). The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), as amended.").

3. To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Ma Kujanek v. Houston Poly Bag I Ltd.*, 658 F.3d 483 at 489 (5th Circuit 2011), *Martin on Behalf of Cal–Tex Protective Coatings v. Frail*, 2011 WL 13175089 at *14 (W.D. Tex. 2011), *Main v. American Airlines Inc.*, 248 F.Supp.3d 786 at 792 (N.D. Tex. 2017).

4. The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent

process for selecting investment options and service providers," including providers of the Plan's administrative and recordkeeping ("RKA") services.[3] *See also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5. With regard to plan fees, the DOL states "You should know that your employer also must consider the fees and expenses paid by your plan."[4]

6. Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

7. At all times during the Class Period, the Plan had over three billion dollars in assets under management. At the start of the Class Period in 2020, the Plan had $3,348,215,099 in assets under management. *See* 2020 Form 5500s for the Plan, Schedule H at 2.

8. By 2023, the Plan had $3,529,024,968 in assets under management. *See* 2023 Form 5500s for the Plan, Schedule H at 2.

9. The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. In 2021, only 0.2 percent (1,011 of 641,747) of plans in the country had more than $1 billion in assets under

---

[3] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited November 12, 2025).

[4] *Id.*

management.[5] In addition, this was true at the start of the Class Period in 2020 where only 0.1 percent (892 of 616,050) of 401(k) plans in the country were as large as the Plan.[6]

10. As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.

11. The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 13,844 participants. *See* Schedule H, attached to 2020 Form 5500 for the Plan, at 2. By 2023, the Plan had 14,552 participants. *See* Schedule H, attached to 2023 Form 5500 for the Plan, at 2.

12. For comparison, according to information derived from ERISApedia.com's database, a service that compiles all Form 5500s filed with the DOL by retirement plans, in 2020, there were only 198 defined contribution plans (401k, 401a, and 403b) in the country with between 15,000 and 19,999 participants.

13. The marketplace for retirement plan services is established and competitive. Accordingly, as a jumbo plan, in addition to the large number of participants, the Plan had substantial bargaining power to obtain high-quality, low-cost RKA and managed account services. The Plan's fiduciaries, however, did not try to reduce the Plan's expenses to ensure they were prudent. Rather, the Plan's fiduciaries allowed unreasonable expenses to be charged to participants for RKA services and managed account services.

14. Defendants caused the Plan to enter into an arrangement with Alight Financial Solutions, LLC ("Alight"), and during the Class Period, Alight was a party-in-interest engaging in

---

[5] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2020 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2023-09/23-rpt-dcplan-profile-401k.pdf.

[6] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2019 at Ex. 1.2, p. 7, available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

party-in-interest transactions. Specifically, Alight received millions of dollars in exchange for recordkeeping services and managed account services rendered to the Plan. This arrangement and transactions with Alight are prohibited transactions because it "amounts to a 'direct or indirect ... furnishing of services ... between the plan and a party in interest,' 29 U.S.C. § 1106(a)(1)(C)." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

15. During the putative Class Period, Defendants, as the "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties owed to the Plan, to Plaintiffs, and to the other participants of the Plan by engaging in prohibited transactions in violation of 29 U.S.C. § 1106 (a)(1)(C).

16. Plaintiffs also allege that Defendants breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by failing to defray[] reasonable expenses of administering the [Plan]. 29 U.S.C. § 1104(a)(A)(ii). Defendants' failure stems from the use of Plan participant forfeited funds to reduce employer contributions to the Plan instead of using the funds to reduce or eliminate the amounts charged to Plan participants for Plan administrative costs. This action by the Defendants was a clear breach of the duties of prudence and loyalty to Plan participants and cost Plan participants millions of dollars.

17. During the putative Class Period, Defendants, as the "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*: (1) engaging in prohibited transactions in violation of 29 U.S.C. § 1106 (a)(1)(C); and (2) failing to defray reasonable expenses of administering the Plan.

18. Defendants' actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

19. Based on this conduct, Plaintiffs assert claims against Defendants for violation of ERISA's prohibited transactions (Count I), breach of the fiduciary duty of loyalty (Count II), and breach of ERISA's Anti-Inurement Provision (Count III).

## II. JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

21. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process. Specifically, Siemens conducts business in Texas and has an office located at 405 Deerwood Glen Drive, Deer Park, Texas. *See* https://omtraining.siemens-energy.com/w/us/venues/2-siemens-energy-fsp-houston.

22. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391, because some or all of the acts, omissions and/or violations of ERISA giving rise to the action occurred in this District, Plaintiff Babinski resides within this District, and Defendants reside and may be found in this District.

## III. PARTIES

### Plaintiffs

23. Brian Babinski ("Babinski") resides in Baytown, Texas. During his employment, Plaintiff Babinski participated in the Plan paying fees associated with his Plan account. Plaintiff Babinski suffered injury to his Plan account by paying excessive RKA costs, including managed account fees. Plaintiff Babinski also suffered injury due to the fact that Defendants failed to use

forfeited Plan funds to pay Plan administrative costs which, if used to pay for administrative costs, would have reduced or eliminated the amounts charged to Plaintiff Babinski's individual account to pay for the administrative costs.

24. Patrick Kennedy ("Kennedy") resides in Gadsden, Alabama. During his employment, Plaintiff Kennedy participated in the Plan paying fees associated with his Plan account. Plaintiff Kennedy suffered injury to his Plan account by paying excessive RKA costs, including managed account fees. Plaintiff Kennedy also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan administrative costs which, if used to pay for administrative costs, would have reduced or eliminated the amounts charged to Plaintiff Kennedy's individual account to pay for the administrative costs.

25. Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duties as described herein.

26. Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

***Company Defendant***

27. Siemens Energy, Inc. is the sponsor and a named fiduciary of the Plan with a principal place of business at 4400 N. Alafaya Trail, Orlando, Florida. *See* 2023 Form 5500 for the Plan, at 1. Siemens is a global leader in energy technology.[7]

28. The Company is a plan sponsor and a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A). *See* Siemens Energy, Inc. Savings Plan, effective September 28, 2020 ("Plan Doc."), at 3 ("'Committee' or 'Committees' means the Administrative Committee and the Investment Committee appointed by the Board of Directors to manage and administer the Plan").

29. Through its Board, Siemens appointed the Plan's Administrators. *See id*. Under ERISA, fiduciaries with the power to appoint have a concomitant fiduciary duty to monitor and supervise their appointees.

***Board Defendants***

30. The Company acted through the Board to perform the Company's Plan-related fiduciary functions. As indicated above, the Board appointed the members of the Administrative Committee and Investment Committee to serve as the Plan Administrators.

31. Accordingly, the Board had the fiduciary duty to monitor and supervise the Committees while they performed their fiduciary role.

32. Each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each exercised discretionary authority to appoint and/or monitor the Committees, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

---

[7] *See* https://www.siemens-energy.com/us/en/home.html, last accessed on July 1, 2025.

33. Members of the Board of Directors for Siemens during the Class Period are collectively referred to herein as the "Board Defendants."

***Administrative Committee Defendants***

34. "The Administrative Committee shall be responsible for the administration, interpretation and compliance requirements pertaining to the Plan. These responsibilities include, but are not limited to, reviewing claims and adjudicating appeals; monitoring Plan compliance with laws, regulations and court decisions as related to Plan design, administration, communication and reporting requirements; approving actuarial tables for optional forms of benefit payments; and approving, jointly with the Investment Committee, the payment of administrative expenses from the Fund." Plan Doc., at 41.

35. The Administrative Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

36. The Administrative Committee and unnamed members of the Administrative Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Administrative Committee Defendants."

***Investment Committee Defendants***

37. "The Investment Committee shall be responsible for investing the assets of the Plan and monitoring the investment performance of the investment funds made available from time to time under the Plan for investment of Members' Accounts." Plan Doc., at 41.

38. The Investment Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

39. The Investment Committee and unnamed members of the Investment Committee during the Class Period (referred to herein as John Does 21-30), are collectively referred to herein as the "Investment Committee Defendants."

***Benefits Committee Defendants***

40. The Administrative Committee and the Investment Committee may have been combined into one committee, the Siemens Energy, Inc. Benefits Committee ("Benefits Committee"). *See* Plan Doc., at 40 ("The Plan shall be administered by the Administrative Committee and the Investment Committee, ***which may be combined in one Committee***, and which shall have the respective powers, duties and responsibilities set forth in specific provisions of the Plan.") (emphasis added).

41. The SPD identifies the Benefits Committee as the Plan Administrator and also describes the responsibilities of the Benefits Committee, which are the same as the Administrative Committee and Investment Committee's responsibilities. *See* SPD, at 34 ("The Benefits Committee of the Plan is responsible for the administration, interpretation and compliance requirements pertaining to the Plan. This includes reviewing claims for benefits under this Plan and deciding appeals on denied benefit claims. The Benefits Committee is also responsible for investing the assets of the Siemens Energy, Inc. Pension Plan and monitoring the investment performance of the various investment funds comprising the trust fund of this Plan.").

42. Further the Auditor's Reports attached to the Form 5500s for the Plan were addressed to the Benefits Committee. *See* Auditor's Report, attached to the 2023 Form 5500 for the Plan, at 1; *see also id.*, at 7 ("The Siemens Energy, Inc. Benefits Committee (Benefits Committee) is responsible for administering the Plan's operations and for monitoring investments by the Plan.").

43. The Benefits Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

44. The Benefits Committee and unnamed members of the Benefits Committee during the Class Period (referred to herein as John Does 31-40), are collectively referred to herein as the "Benefits Committee Defendants."

45. Collectively, the Administrative Committee, Investment Committee and Benefits Committee are referred to as the "Committees."

## IV. CLASS ACTION ALLEGATIONS[8]

46. Plaintiffs brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):

> All persons, except Defendants and any fiduciary of the Plan and their immediate family members, who were participants in or beneficiaries of the Siemens Energy, Inc Savings Plan at any time between September 28, 2020 to the date of judgment (the "Class Period").[9]

47. The members of the Class are so numerous that joinder of all members is impractical. The 2023 Form 5500 lists 14,552 "participants with account balances as of the end of the plan year." 2023 Form 5500, at 2.

---

[8] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[9] Plaintiffs reserve their right to seek modification of the close of the Class Period in the event that further investigation/discovery reveals a more appropriate end period.

48. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and has suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members, and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

49. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A. Whether Defendants are/were fiduciaries of the Plan;

B. Whether Defendants breached their fiduciary duties of prudence by engaging in the conduct described herein;

C. Whether the Defendants failed to adequately monitor the Committees and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D. The proper form of equitable and injunctive relief; and

E. The proper measure of monetary relief.

50. Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action, and anticipates no difficulty in the management of this litigation as a class action.

51. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

52. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V. THE PLAN

53. "This Plan is a defined contribution plan. This means that Company contributions are made in specific (defined) amounts, but the benefit you receive at retirement or termination depends on a number of variable factors." SPD, at 34.

54. "The purpose of the Siemens Energy, Inc. Savings Plan is to encourage and assist eligible employees to save part of their income on a regular basis through payroll deductions and salary reduction, supplemented by contributions by the participating employers." Plan Doc., at 1.

### ***Eligibility***

55. Employees are typically eligible to participate in the Plan when they are hired by the Company. *See* Plan Doc., at 10 ("[E]ach other Employee will be eligible to become a Member

of the Plan as of the Enrollment Date coincident with or next succeeding the date on which such Employee's Continuous Employment commenced if he then is employed by an Employer.").

56. After thirty (30) days of becoming eligible to participate in the Plan, employees are automatically enrolled in the Plan. *See* SPD, at 3.

57. "A Temporary Employee shall be eligible to become a Member of the Plan as of any Enrollment Date coincident with or next succeeding the date on which such Temporary Employee completes a Year of Service if he is then employed by an Employer." *Id.*

***Contributions***

58. Eligible employees can make the following types of contributions to their Plan accounts: "either before-tax contributions, Roth 401(k) contributions, after-tax contributions, or a combination." SPD, at 3.

59. Employees may "may save up to 50% of your pay (in 1% increments) in the Plan." SPD, at 5.

60. "If you are a non-union employee, the Company will match 100% of your "Basic Contributions". Effective January 1, 2024, these matching contributions are considered "safe harbor" matching contributions." SPD, at 11; *see also id*. ("'Basic Contributions' are the first 6% of your pay that you contribute, regardless of whether you save on a before-tax, Roth 401(k), or after-tax basis.").

***Vesting***

61. Employees are 100% vested in their contributions to their Plan account. *See* SPD, at 26 ("You are 100% vested in (entitled to) your before-tax, Roth 401(k), after-tax, catch-up, rollover, Roth rollover, and SBCC contributions, along with related earnings, at all times.").

62. Employees are 100% vested in Company matching contributions made after January 1, 2024 after two years of service. *See* SPD, at 26 ("You become vested in your safe harbor matching contributions made or after January 1, 2024, and related earnings, once you complete two years of vesting service.").

63. For employees that left the Company prior to January 1, 2024, they become fully vested in matching contributions based upon years of service as demonstrated below:

| Years of Vesting Service | Percent Vested |
|---|---|
| Fewer than 2 | 0% |
| 2 but fewer than 3 | 40% |
| 3 but fewer than 4 | 60% |
| 4 but fewer than 5 | 80% |
| 5 or more | 100% |

SPD, at 26-27

***Forfeitures***

64. "If you leave the Company before you are fully vested in Company contributions, the non-vested portion of these contributions and related earnings will be forfeited." SPD, at 29.

65. "Any amount which shall be forfeited by a Member pursuant to Section 4.2, 5.2, 6.8 or 11.2 shall be used, as soon as practicable, to pay reasonable administrative expenses of the Plan, other than such reasonable administrative expenses charged to Members' Accounts monthly or otherwise, as determined by the Company, or to reduce Employer Contributions." Plan Doc., at 38.

## VI. DEFENDANTS COMMITTED A PROHIBITED TRANSACTION RESULTING IN EXCESSIVE RKA COSTS FOR THE PLAN AND ITS PARTICIPANTS

66. During the Class Period, Defendants entered into a contract with Alight to provide RKA services and managed account services to the Plan. However, such an engagement and subsequent services provided by Alight constitute prohibited transactions under ERISA.

67. 29 U.S.C. §§ 1106(a)(1)(C) provides that "(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect … (C) furnishing of goods, services, or facilities between the plan and a party in interest."

68. Here, Alight was a party in interest to the Plan as it was receiving compensation for RKA services, as well as compensation from managed account services from the Plan.

69. The Notes to the Financial Statements attached to the Auditor's Report in the Form 5500s filed during the Class Period state specifically that Alight was a party in-interest:

> Alight Solutions, LLC provides recordkeeping services to the Plan. Other service providers also provide investment advisory services and certain other administrative services. Therefore, transactions with these service providers qualify as party-in-interest transactions.

*See* Auditor's Report attached to 2023 Form 5500, at 15.

### A. Costs for Recordkeeping Services Vary Little Between Competing Providers for a Plan with a Substantial Number of Participants

70. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

71. There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet

style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A. Basic account recordkeeping (e.g. demographic, source, investment and vesting records);

B. Multi-channel participant and plan sponsor access (e.g. phone, web);

C. Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

D. Payroll service (e.g. hardships, in-service withdrawals, termination distributions);

E. Participant tax reporting services (e.g., IRS Form 1099-R);

F. Participant confirmations, statements, and standard notices;

G. Plan-level reporting and annual financial package (excluding IRS Form 5500);

H. Participant education (e.g. newsletters, web articles, standard communication materials);

I. Plan consulting (e.g., preapproved document services, operational materials);

J. Plan consulting (e.g. preapproved document services, operational compliance support).

72. This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. As explained in more detail below,

the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

73. The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte services typically include, but are not limited to, the following:

a. Loan processing;

b. Brokerage services/account maintenance (if offered by the plan);

c. Distribution services; and

d. Processing of qualified domestic relations orders.

74. All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

75. The cost of providing recordkeeping services depends in large part on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. *See* 1998 DOL Study,[10] at 4.2.2. ("Basic per-participant administrative charges typically reflect minimum charges and sliding

[10] https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf ("1998 DOL Study").

scales that substantially reduce per capita costs as plan size increases.”). When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increases, the average cost per participant decreases. ***Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.***[11]

76. In general, the level, number and character of participant services provided by the recordkeeper have minimal impact upon the costs of providing recordkeeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper ***notwithstanding the level, number and character of the services provided to that additional participant.***

77. Recordkeepers for large 401(k) plans such as Fidelity, Vanguard, Empower, and Voya, among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services).

78. Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

### B. Managed Account Services Are Among the Services A Recordkeeper Can Provide for Minimal costs

[11] “[T]he actual cost of administrative services is more dependent on the number of participants in the plan.” There is no “logical or practical correlation between an increase in administrative fees and an increase in plan assets.” Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/.

79. As noted above, Plan consulting services, including assistance in selecting the investment lineup offered to participants, are among the core services that recordkeepers provide to retirement plans. Managed accounts are investment services under which providers make investment decisions for specific participants to allocate their retirement savings among a mix of assets, commonly referred to as asset allocation. Managed account providers in 401(k) plans limit the investment options they consider to those funds chosen by the plan sponsor to create Plan participants' asset allocations.

80. Most managed account service providers utilize computer programs to create plan participants' asset allocations.

81. In general, managed account services are investment services under which a participant pays a fee to have a managed account provider invest the participant's account in a portfolio of preselected investment options.

82. Managed account providers "generally offer the same basic service—initial and ongoing investment management of a 401(k)-plan participant's account based on generally accepted industry methods." The United States Government Accountability Office ("GAO"), 401(K) PLANS: Improvements Can Be Made to Better Protect Participants in Managed Accounts, at 14 (June 2014), available at https://www.gao.gov/assets/gao-14-310.pdf.

83. Generally, two types of strategies are employed, "customized" or "personalized." Customized service—allocating a participant's account based solely on age or other factors that can be easily obtained from the plan's recordkeeper, such as gender, income, current account balance, and current savings rate; or personalized service, which purports to take into account additional personal information to inform asset allocations, such as risk tolerance or spousal assets. In practice, little to no material customization is provided to the vast majority of plan participants which results in no material value to most participants relative to the fees paid.

84. Managed account services merely mimic the asset allocations available through a target date fund while charging additional unnecessary fees for their services. Indeed, customized or personalized managed accounts offer little to no advantage over lower-cost funds of funds, such as target-date funds, risk-based funds and balanced funds.

85. Participants who sign up for managed account services are generally charged an annual fee that is a percentage of the participant's account balance regardless of which investment approach they choose.

86. The Plan participant has no control over the fee rate they are charged. The fee levels are determined at the Plan level through a contractual agreement between the service provider and the Plan fiduciaries.

87. For at least the past decade, jumbo plans have been able to negotiate multiple facets of the fees charged by managed account providers. Managed account services are offered by covered service providers to increase the revenue they generate through their relationship with a retirement plan.

88. As with any service provider, one of the most important factors when selecting a managed account provider is fees. Managed account services have historically been expensive compared to other alternatives, such as target date funds that provide the materially same service at a much lower cost. Vanguard reported in August 2013 that managed account services generally return less than or equal to the returns of Vanguard's lower-cost professionally managed allocation products, such as target-date funds, risk-based funds, and balanced funds.[12]

---

[12] Vanguard, Professionally Managed Allocations and the Dispersion of Participant Portfolios (Valley Forge, PA; August 2013).

89. Prudent fiduciaries should regularly monitor the amount of managed account service fees the plan is paying and ensure the fees are reasonable compared to what is available in the market for materially identical services. The most effective way to ensure a plan's managed account service fees are reasonable is to periodically solicit bids from other managed account service providers, stay abreast of the market rates for managed account solutions, and/or negotiate better rates with the managed account service providers.

**C. The Plan's Recordkeeping Fees were Excessive**

90. Because recordkeeping costs are not principally affected by individual account asset size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of assets. *See* Mercer Best Practices at 3. Otherwise, as plan assets grow, the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.

91. As demonstrated in the charts below, the Plan's participants were saddled with above-market administrative and recordkeeping fees throughout the Class Period.

92. The Plan's per participant RKA fees were as follows:

| **Siemens Plan** | | | |
|---|---|---|---|
| **Plan Year** | **Participants** | **Total Direct Costs** | **Per Participant Charge $PP** |
| 2020 | 13,844 | $159,780 | $11.54 |
| 2021 | 13,311 | $2,536,210 | $190.53 |
| 2022 | 13,426 | $1,969,527 | $146.69 |
| 2023 | 14,552 | $2,980,761 | $204.84 |

93. Looking at recordkeeping costs for plans similar in size to the combined assets and participant size of the Plan during the Class Period shows that the Plan was paying higher recordkeeping fees than its peers.[13]

| Recordkeeper | Plan Name | Plan Year | Assets Under Management | Participants | Schedule C Codes | Indirect Compensation | Cost |
|---|---|---|---|---|---|---|---|
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2021 | $1,341,037,601 | 10,170 | 37 60 64 65 71 | Yes - $0 | $28 |
| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2021 | $693,883,632 | 14,583 | 37 60 64 65 | Yes - $0 | $5 |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2021 | $1,706,447,554 | 15,788 | 37, 60, 64, 65, 71 | Yes - $0 | $26 |
| **Alight** | **Siemens Plan** | **2021** | **$3,710,144,086** | **13,311** | **15 50** | **Yes - $0** | **$191** |
| | | | | | | | |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2022 | $1,475,238,032 | 16,973 | 37, 60, 64, 65, 71 | Yes - $0 | $29 |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2022 | $1,099,817,927 | 11,787 | 37 60 64 65 71 | Yes - $0 | $30 |
| **Alight** | **Siemens Plan** | **2022** | **$3,104,111,508** | **13,426** | **15 50** | **Yes - $0** | **$147** |
| | | | | | | | |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2023 | $1,837,546,518 | 18,163 | 37, 60, 64, 65, 71 | Yes - $0 | $32 |
| Fidelity | Fortive Retirement Savings Plan | 2023 | $1,915,519,824 | 13,503 | 37, 64, 65, 71 | Yes - $0 | $30 |
| **Alight** | **Siemens Plan** | **2023** | **$3,529,024,968** | **14,552** | **15 50** | **Yes - $0** | **$205** |

94. The above chart demonstrates that for similar plans, regarding assets and participants, the Plan had one of the highest recordkeeping fees over the course of the Class Period.

95. The 2021-2024 Plan Fee Disclosure identifies the below fees for Professional Management Program Fees. Specifically, the Fee Disclosure states, "If you are enrolled in the

[13] Unless otherwise noted, these fees are taken from the Form 5500.

Professional Management Program offered by Alight Financial Advisors, you are charged an annual fee that is based on the size of your account:

- The first $100,000 0.50% of assets
- The next $150,000 0.45% of assets
- Above $250,000 0.30% of assets

The fee is calculated based on the average assets under management in your account for the month and is automatically deducted from your SESP account at the start of the following month, or at the time plan activity brings your account balance to $0 if mid-month." 2021-2024 Fee Disclosure, at 2.

96. To the extent the total reported RKA amounts in the Form 5500s included the Plan's managed account service, that service did not justify any material increase in the RKA costs to the Plan.

97. Defendants could have offered the exact same managed account services at a lower cost by using a different managed account provider or relying on index or target date funds as alleged herein. As addressed below, Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from Alight or Defendants could have obtained the materially same managed account services for less through another provider if it had solicited competitive bids for the same services.

98. Further, Defendants could have utilized a target date fund instead of the managed account but did not do so. As the GAO recognized in its reports on managed accounts, "Similar advantages … can be achieved through other retirement investment vehicles outside of a managed account and without paying the additional managed account fee. For example, in one recent study, a record keeper that offers managed accounts through its platform showed that there are other ways

to diversify using professionally managed allocations, such as target date funds, which can be less costly." *See* GAO report.

99. As a result, based on the value provided, the reasonable fee for the managed account service was zero or very close to zero, and the use of the managed account services provided by Alight cost the Plan at least $7.4 million from 2021 to 2023. *See* Tables at ¶ 128, *supra*.

100. Of additional importance, even if some portion of the managed account service fee was warranted, the fees charged were grossly excessive. Alight's managed account service charged fees based on the amount of assets in a participants' Plan account rather than a per capita charge. This had the effect of increasing costs to Plan participants without an increase in service level. This is unreasonable.

101. The Plan's $181 per participant fee from 2021 to 2023 is 602% greater than the average fee of $26 per participant from 2021 to 2023 for the seven (7) plans listed above.

102. This vast discrepancy between the Plan's RKA fees and comparable plans existed from 2021 through 2023. Indeed, the figures in the above chart are just an example of the Plan's excessive RKA fees from 2021 through 2023.

103. Further, because Alight was a party-in-interest, the Plan's fiduciaries should have taken these additional sources of income into consideration to reduce the excessive RKA fees paid to Alight.

104. Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

105. For the above reasons, Defendants committed a prohibited transaction as it relates to the Plan and its participants' payment of RKA fees, inclusive of any account management fees.

## VII. THE COMPANY IMPROPERLY REDUCED ITS PLAN CONTRIBUTIONS THROUGH FORFEITURE AMOUNTS

106. During the Class Period, Defendants breached their ERISA fiduciary duties by misusing the Plan's assets for Defendants' own benefit and to the detriment of Plan participants.

107. As alleged above, Defendants had a choice on how to utilize forfeited amounts. At the discretion of Defendants in their fiduciary capacity, forfeitures may be used to either pay the Plan's expenses or reduce the Company's contributions to the Plan.

108. Using the forfeitures to reduce Company contributions is always in the best interest of Siemens because that option would decrease its own contribution costs.

109. Absent any risk that Siemens would be unable to satisfy its contribution obligations, using forfeitures to pay Plan expenses would be in the participants' best interest because that option would reduce or eliminate amounts otherwise charged to their accounts to cover such expenses.

110. In deciding between using forfeitures to benefit the Company or using forfeitures to benefit the participants, Defendants are presented with a conflict of interest in administering the Plan and managing and disposing of the Plan assets.

111. Despite the conflict of interest presented by this decision, Defendants failed to undertake any investigation into which option was in the best interest of the Plan's participants and beneficiaries.

112. Defendants did not, for example, investigate whether there was a risk that Siemens would be unable to satisfy its contribution obligations if forfeitures were used to pay Plan expenses, or evaluate whether there were sufficient forfeitures to eliminate the Plan's expenses charged to

participants and still offset a portion of Siemens' own contribution obligations, as a prudent person would have done.

113. To illustrate the Company's financial soundness, the Company's recent Press Release touted its financial strength by recognizing "the significant progress Siemens Energy has made in the past two years in improving margins, strengthening cash flow and reinforcing its financial position."[14]

114. Defendants also failed to consult with an independent, non-conflicted decision-maker to advise them in deciding upon the best course of action for allocating the forfeitures in the Plan, as a prudent person would have done.

115. Although ERISA requires fiduciaries to manage the Plan's assets solely in the interest of participants and although the Plan grants Defendants discretion to use forfeitures to pay Plan expenses, thereby reducing or eliminating the amounts charged to participant accounts to cover such expenses, Defendants have consistently declined to use the Plan's assets for such purpose during the putative class period.

116. Since at least the beginning of the Class Period, Defendants have improperly used forfeited non-vested Plan assets for the Company's own benefit to reduce future Company contributions instead of using the funds to benefit Plan participants.

117. According to information from the Plan's Form 5500s, the following represents the amount of the forfeiture improperly used to offset the Company's contributions to the Plan, and the amounts used to pay for Plan administration costs:

| Plan Year | Forfeiture Amount | Offset Company Contributions | Offset Plan Expenses |
| --- | --- | --- | --- |

[14] June 17, 2025 Press Release (quoting Maria Ferraro, Chief Financial Officer of Siemens Energy), available at https://www.siemens-energy.com/us/en/home/press-releases/Siemens_Energy_secures_grade_ratingU_from_Moodys.html.

| | | | |
|---|---|---|---|
| 2020 | Unknown | $335,043 | $0 |
| 2021 | Unknown | $1,517,223 | $0 |
| 2022 | Unknown | $1,135,338 | $0 |
| 2023 | Unknown | $1,324,984 | $0 |
| **TOTAL** | | $4,312,588 | **$0** |

118. For these reasons, Defendants violated their fiduciary duties.

**COUNT I**
**Prohibited Transactions**
**(Against All Defendants)**

119. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

120. ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

121. ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

122. ERISA § 3(9), 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

123. Defendants' decision to agree to pay excessive fees to Alight as recordkeeper for the Plan amounted to a direct or indirect "furnishing of goods, services, or facilities between the

plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

124. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

**COUNT II**
**Breach of Fiduciary Duty of Loyalty**
**(Asserted against the Company, the Committees and Board Defendants)**

125. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

126. At all relevant times, the Company, the Committee Defendants, and the Board Defendants ("Loyalty Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

127. As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).

128. The Loyalty Defendants were required to discharge their duties to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan.

129. The Loyalty Defendants failed to exercise their duty of loyalty to the Plan and its participants by utilizing forfeited funds in the Plan for the benefit of the Company instead of the sole interest of the Plan participants and beneficiaries.

130. The Loyalty Defendants used these Plan assets for the purpose of reducing the Company's own contributions to the Plan, thereby saving the Company millions of dollars each year at the expense of the Plan which received decreased Company contributions, and its participants and beneficiaries were forced to incur avoidable expense deductions to their individual accounts.

131. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars in losses.

132. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

133. Each Loyalty Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT III**
**Breach of ERISA's Anti-Inurement Provision**
**(Asserted against the Company and the Board Defendants)**

134. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

135. Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

136. Because all forfeited Plan participant funds are initially placed in the Plan's trust, these forfeited funds are Plan assets.

137. The Company's use of the forfeited funds to defray its own contributions to the Plan in order to save itself millions of dollars in funds that the Company would otherwise have to contribute to the Plan, caused the assets of the Plan to inure to the benefit of the Company in violation of 29 U.S.C. § 1103(c)(1).

138. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of ERISA's anti-inurement provision, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

139. Each Loyalty Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and request that the Court awards the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration that the Defendants have breached their fiduciary duties under ERISA;

D. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants

made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E. An order requiring the Company to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F. Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G. An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I. An award of pre-judgment interest;

J. An award of costs pursuant to 29 U.S.C. § 1132(g);

K. An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L. Such other and further relief as the Court deems equitable and just.

Dated: November 17, 2025

Respectfully submitted,

*Mark K. Gyandoh*
**CAPOZZI ADLER, P.C.**
Mark K. Gyandoh, Esquire
(Admitted *Pro Hac Vice*)
James A. Maro, Esquire
(Admitted *Pro Hac Vice*)

312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
jamesm@capozziadler.com
Tel.: (610) 890-0200
Fax: (717) 232-3080

Daniel L. White, Esquire
TX Attorney ID #24090588
**WARD + WHITE PLLC**
114 ½ E. Louisiana Street
Suite 206
McKinney, TX 75069
Email: dwhite@wardwhitepllc.com
Tel.: (469) 941-0040

*Counsel for Plaintiffs and the Putative Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 17, 2025, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By: *Mark K. Gyandoh*
Mark K. Gyandoh, Esq.